## Case No. 7,106.
### The ISIS.

## Case No. 7,107.
### The ISLAND BELLE.
[21 Leg. Int. 60; 26 Law Rep. 263; 5 Phila. 501.]

District Court, E. D. Pennsylvania. Feb. 19, 1864.

CADWALADER, District Judge. This vessel, formerly the General Ripley, was built in 1861, at Charleston, South Carolina. She went to sea on her first voyage, without being coppered, in the latter part of October, 1861, with a cargo of rice; and, having avoided the blockading force, arrived at Nassau, New Providence, early in November. On the 12th November, 1861, she sailed, without having unladen her cargo, for St. Jago de Cuba, which she reached on the 20th. On the 22d she sailed, without having unladen, for Trinidad de Cuba, where, on the 28th, her cargo was discharged. She there took in a cargo of sugar and molasses,

with which, on 20th December, 1861, she sailed for Baltimore, where it was intended to copper her. On the 31st December, 1861, she was captured when about twelve miles southeast of Bull's Bay. It has appeared, upon investigation, that, on this voyage, no breach of blockade was intended, but that the destination was really Baltimore. The only questions remaining have been those of ownership of the captured cargo and vessel.

Her master, Thomas Phillips, had commanded her from the time when she was built. He describes himself as a British subject, having no permanent place of residence, and as having never had any interest in either vessel or cargo, otherwise than as master. He states that, at Charleston, the person with whom he transacted all business concerning the vessel, was a Mr. Canalle, a resident of that place, and that her owners were four other residents of Charleston, and this Mr. Canalle. That the ownership of the outward cargo of rice was in the same five persons appears, I think, from the manifest and other papers. The manifest shows that the rice was taken on board in five distinct shipments, marked A, B, C, D, E, corresponding with the number of part owners of the vessel. The consignees of the vessel and cargo at Nassau were Sawyer and Menendez. To these gentlemen Mr. Canalle, who corresponded with them as if he were sole owner of the vessel and cargo, wrote from Charleston on 5th October, 1861, with directions to dispose of the cargo for his account, and afterwards, if they could dispose of the vessel, to do so, and invest the proceeds of both vessel and cargo in English bills of exchange. He wrote, in this letter, that the vessel was new, and too good to be used in running the blockade; and moreover, that when she was loaded, there was difficulty in getting her in and out. He added, "The vessel is held in Captain Phillips' name. This is done to facilitate the disposal of her, and to prevent the necessity of a power of attorney." Capt. Phillips deposes that, when the vessel was built, he gave to the builder, in payment for her, a check for $10,000, which was sent to him (the captain) for that purpose by Mr. Canalle. Mr. Sawyer, of the firm of Sawyer & Menendez, deposes to the arrival at Nassau of the General Ripley, owned by Captain Phillips, in trust for sale for Mr. Canalle, with, as deponent was informed, verbal instructions to Captain Phillips to sell her in case a fair price could be obtained. Mr. Sawyer further deposes that he thereupon, himself purchased her, and on the 8th of November received from Captain Phillips a bill of sale, of which a certified copy is produced. In this bill of sale Captain Phillips describes himself as "of Charleston, in the state of South Carolina." This must be deemed his commercial residence, which, in a prize court, defines his personal relation.

The apparent ownership of the vessel, therefore, could not have continued in his name without liability, as the property of a hostile person, to be captured anywhere at sea by cruisers of the United States. He deposes that Mr. Sawyer paid him no money on account of the vessel, and that no consideration passed therefor to his knowledge. This is explained by depositions taken at Nassau, including those of both members of the firm of Sawyer & Menendez. From these depositions it appears that Mr. Sawyer, having funds in bank to his private credit, drew upon them, his own check of 8th November, 1861, for £2083. 6s. 8d., the amount of the consideration expressed in the bill of sale of that date, payable to the order of Sawyer & Menendez, who had their partnership account in the same bank; and that this check was presented by Mr. Menendez, and its amount credited to their firm, and charged to Mr. Sawyer by the bank. These gentlemen depose that the price of the vessel was $10,000, equal, in British sterling money, to the above amount of £2083. 6s. 8d., which was thus paid. Annexed to the deposition of Mr. Sawyer, who states that, at this time, he had no money whatever belonging to Mr. Canalle, is a letter from Mr. Canalle, dated Charleston, S. C., December 12, 1861, to Sawyer & Menendez, containing this passage: "Having received several of your favors, one of which contained account sales of the schooner Gen'l Ripley, also sales of the cargo of rice, have been examined and found correct; also an account current to date, and a bill on England for the amount in full, for which please accept my thanks." No account whatever, or copy of one, and no copy of any letter to Canalle is produced. No correspondence or account between Sawyer & Menendez and the consignees at Trinidad has been produced. The objection to Mr. Sawyer's purchase of the vessel, through a sale effected by his own firm as agents of the seller, loses part of its force when we consider the effect attributable to the presence and concurrence of Captain Phillips. There will be no necessity to consider particularly this objection to the alleged sale.

On the 11th November, 1861, at Nassau, the vessel, under the name of the Island Belle, was registered as Mr. Sawyer's. On the same day that gentleman executed two papers. One of them constituted Captain Phillips the supercargo, with unlimited authority over the employment and management of the vessel in her intended voyage to Cuba, and in her future voyage or voyages from that island to any port or ports. The other paper was a power of attorney, such as, in the late British merchant shipping act [Gen. Stats. 1854, p. 611; 17 & 18 Vict. c. 104], is called "a certificate of sale." The latter paper, which was to remain in force for twelve months, the longest time allowed by that act, authorized Captain Phillips to sell the vessel at any port in the United States

or the West Indies, for a sum not less than £2291. 13s. 4d. These papers were unrevoked at the time of capture. Captain Phillips, as the general representative of Mr. Sawyer, is therefore peculiarly accredited by him. This gives unusual force to certain statements of Captain Phillips concerning the vessel. He appears to be an intelligent person, and a good man of business. He deposes that in October, 1861, when he was about to sail from Charleston, he there signed a bill of sale of the vessel, setting forth that he was the owner, and conveying her to Mr. Sawyer; and that on arriving at Nassau, he delivered the bill of sale thus executed by him, to Mr. Sawyer. If this was the same bill of sale of which a copy is annexed to the Nassau depositions, the date may have been in blank, and that of 8th November inserted there. But it is more probable that a new bill of sale, in the usual printed form in use at Nassau, was there prepared, and was substituted for the original one. There is no contradiction between the statement of Capt. Phillips and that of Mr. Sawyer. If there had been, the statement of the captain must, according to the general rule in prize cases, prevail. This rule applies here with peculiar force, inasmuch as he was not the simple navigator of the vessel, but, as has been already explained, the general representative of Mr. Sawyer in respect of her.

The cargo from Trinidad for Baltimore was shipped by two commercial houses. The shippers of one portion of it wrote to their correspondents in Baltimore: "It may be that Captain Phillips may feel disposed to come back with his vessel to our port, and to take half interest in a small cargo as per note we enclose. In that case he will pay to you half the amount of invoice, and the other half you will charge us in account." The shippers of the other portion, in a letter to their Baltimore agents, referring to a signature of Captain Phillips at foot of it, wrote as follows: "Captain Phillips, intending to copper his vessel with you, and for other expenses which he may be obliged to incur, we beg to open herewith, in his favor, a credit to the extent of $4000, of which please to take note and pay to him any amount up to the stated sum, charging the same to our account." Another letter from the same parties indicates the source of this credit. Here they say: "We have still in hand for the disposal of the captain, the total funds for the proceeds of the load of rice brought here by Island Belle from Nassau, and sold by us; and we doubt whether the captain will be in want of the whole $4000 at your place. In case he does, however, and in case our little lading should not be sufficient to reimburse you, we will, upon the receipt of your disbursement, of course, at once, send other ladings for the possible balance." Two open letters from Sawyer & Menendez, both dated at Nassau on the same day as the above men-

tioned power of attorney and certificate of sale to Captain Phillips, introduce Captain Phillips to the respective correspondents of Sawyer & Menendez at Baltimore and New York. In each letter they say, Captain Phillips "visits your port, in his vessel, on business;" and recommend him to local good offices in the usual form of a commercial introduction. The expression "his vessel" is here of no distinct import. It might have been used as to the master of a vessel who had no proprietary interest in her. But the letters do not import that the business on which he was to visit those places was that of the writers, or either of them. Moreover, if Sawyer & Menendez, or either of them, had owned the vessel and cargo, the correspondence from Trinidad with Baltimore as to the funds retained at Trinidad, was, to say the least, extraordinary. On the other hand, there was nothing extraordinary in this part of the business, if Captain Phillips was navigating the vessel for her former owners in Charleston, and the funds retained as the basis of the credit on Baltimore were held in Trinidad for their account. The parties at Trinidad who shipped the cargo for Baltimore were Spaniards. They shipped it professedly for their own account. The captain claimed it for them, and swore that it belonged to them. That they stood in very friendly relations to the owners of the vessel and of her outward cargo of rice, was apparent. But they might, if they saw fit to retain the proceeds of this rice, have done so, and have made the shipments for Baltimore on their own independent account. That these shipments were owned exclusively by these Spanish shippers was attested by every proprietary document that could have been required for the purpose of attesting it in a suspected case, including oaths for entry at the Baltimore custom-house upon the invoices on board. These oaths of ownership were made conformably to the provisions of the act of congress of 1823. Nothing more could have been expected under an order allowing further proof. It was nevertheless contended, with some apparent force, on the part of the United States, that, as the consignment of rice to Trinidad had been the means of transmitting $4000 of its proceeds to Baltimore to be employed by the master as agent of its owners in coppering the vessel, &c., for their account, the contrivance of shipping the cargo for Baltimore as the property of the Spanish agents who effected this arrangement was obviously collusive, and, in its ultimate effect, if no capture had occurred, would have increased the capital invested for hostile account. The argument was, that if such an arrangement covered from capture property which otherwise would never have been shipped, the consequence would be that any hostile person might, in time of war, send his funds to foreigners, who, retaining them in hand as bankers of the remitter, might, for their own

ostensible account, thus make shipments of which the ultimate avails would either directly or indirectly accrue to his benefit, while the investments would, in the mean time, traverse the ocean exempt from capture. The answer to the argument was, that the possibility of such evils could not be guarded against in prize courts, and that the only question in such cases was that of proprietorship. The true doctrine is that allegations of such proprietorship must be suspiciously regarded, and the fullest proofs of it required. But when such proofs are adduced by the party on whom the burden of proof rests, there cannot be condemnation upon the former suspicion. The cargo in this case was restored by my decree, without any award of costs or damages against the captors. This decree was, on appeal, affirmed.

The remaining question is whether the vessel should be liberated or condemned. The decision as to the cargo has been explained, because the argument showed that it had not been rightly understood. The judgment was upon the ground that, assuming the ownership of the vessel and of the rice and its proceeds to be hostile, this cargo was not, in fact, an investment of the proceeds of the rice, but was a shipment for the independent account of the Spanish parties for whom the captain claimed it. He never interposed any claim for the vessel. Recurring to his peculiar relations to her which have been twice mentioned, this omission is not to be disregarded. It seems, indeed, to admit of but one explanation. The case has been argued as upon a claim by Mr. Sawyer. That gentleman has been represented by those able to give him the best legal advice. He has filed his own and certain other affidavits, all of which, with all the documents offered on his part, have been read as if taken under an order allowing further proof. These affidavits were taken in April, and filed here in November, 1862. They were allowed to be filed, subject to all legal exceptions. If the substantial requirements of a test oath had been fulfilled, I would not regard the informality of the absence of a claim. But no claim, properly speaking, has been presented. If it had been, the affidavit of Mr. Sawyer would not have served the purposes of a test oath. It does not state, as is usual in such cases, that no person was interested in the vessel at the time of capture, or at any time after the commencement of the voyage in which it occurred, and that if restored, she would belong to himself exclusively. He merely deposes that he bought her from the captain, and paid for her with his own money, by his check, as above; that he received the bill of sale, and had her registered in his name under the provisions of the British merchant shipping act; that she remains registered as his property, and that no person whomsoever in the Southern states of America owns any part, share or interest in her. If such non-fulfilment of the requirements of the test

oath were sanctioned, evasions without limit would ensue. Some of the deficiencies of the case, in the absence of such other documents as would have been expected under an order allowing further proof, have been indicated. Assuming the truth to be that, as between Mr. Sawyer and the former owners, their proprietorship was divested irrevocably and that he was, at the time of capture, the absolute owner of the vessel, as ownership is definable in a court of common law, she would, nevertheless, be liable, in a prize court, to condemnation. The rule of decision in some countries has been that, as to a vessel, no change of ownership during hostilities can be regarded in a prize court. In the United States, as in England, the strictness of this rule is not observed. But no change of property is recognized where the disposition and control of a vessel continue in the former agent of her former hostile proprietors; more especially when, as in this case, he is a person whose relations of residence are hostile. That such were the relations of Captain Phillips is apparent. Maritime hostilities could not be prosecuted with any effect if this rule did not apply in an extreme case like this. A vessel, beneficially owned by hostile persons, navigated by a hostile person who is her nominal owner, is transferred by him to their own commercial agent in a foreign country, who immediately executes powers to the same navigator, enabling him not only to conduct and manage her future employment, but to sell her. If, therefore, the case were, as Mr. Sawyer, or, as his advocate, states it, she should, I think, be condemned. I am not aware that there was ever so thin a veil thrown over trade of a hostile district to protect a vessel from capture. But can this be deemed a true state of the facts? If Capt. Phillips tells the truth, as I must believe that he does, the transaction was not a sale and purchase of the vessel, but a paper transfer of her at Charleston, so far executed there that the legal title was to vest, at all events, in Mr. Sawyer, as a British subject. The captain, though for some purposes, himself a British subject, was a person whose residence would have made her liable to capture if he had continued the nominal owner. In the voyage from Charleston, as she was to run the blockade, this was unimportant. The captain had no interest of his own in her. He was to obey his instructions received at Charleston. Their effect was to make it obligatory on him to divest himself at Nassau of all appearance of ownership. His having been required to execute the bill of sale at Charleston proves this. If so, the agency of Sawyer & Menendez to sell her was a fiction. The general tendency of the other evidence is to the same result. I would enter a decree of condemnation at once if there had, in any prior stage of the cause, been a formal order allowing further proof. But, as no such order has been made, I will make it now, allowing for-ty-two days. This will put the case in a proper shape for an appeal, and will give to Mr. Sawyer an opportunity to diminish, as far as may be in his power, the difficulties which he may have occasion to meet in the superior tribunal. It is not probable that my own opinion of the case will be changed by any further proof that may be adduced.